UNITED STATES of America, Appellant,

v.

Eric Gray SNYDER, Defendant, Appellee.

No. 97–1233.

United States Court of Appeals,
First Circuit.

Heard Jan. 8, 1998.

Decided Feb. 12, 1998.

James F. Lang, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief, for the United States.

Victoria L. Nadel, Boston, MA, for defendant, appellee.

Murray Kohn, Brighton, MA, on brief for Massachusetts Association of Criminal Defense Lawyers, amicus curiae.

Before SELYA, Circuit Judge,
CAMPBELL, Senior Circuit Judge, and
BOUDIN, Circuit Judge.

SELYA, Circuit Judge.

█ In this single-issue sentencing appeal, the government implores us to set aside defendant-appellee Eric Gray Snyder's sentence. The district court predicated that sentence on a disparity between the sentence mandated for the offense of conviction by the federal sentencing guidelines and the sentence Snyder likely would have received had state authorities prosecuted him. *See United States v. Snyder*, 954 F.Supp. 19, 22 (D.Mass.1997) (memorandum explicating reasons for sentence). We thus confront a question of novel impression in this circuit: Is federal/state sentencing disparity a permissible basis for a downward departure? We answer that question in the negative. Consequently, Snyder must be resentenced.

## I. BACKGROUND

We touch lightly upon the facts of the case as they are only obliquely relevant to the legal problem that this appeal presents. On January 10, 1995, a known drug user, John Hawk, told a Boston police officer, William Doogan, that Snyder had robbed him and his paramour at gunpoint and stolen a number of Valium tablets. Hawk further stated that Snyder, driving a black Honda and accompanied by Frank Diaferio (a reputed drug dealer known to Doogan), was headed toward Roslindale. Doogan knew that Diaferio resided at 17 Murray Hill Road in Roslindale and he immediately arranged for police surveillance of that locus. When Snyder and Diaferio arrived in the black Honda, the officers found a loaded .32 caliber pistol in a locked briefcase in the car's trunk. Doogan placed Snyder under arrest. During a search at the station house, police officers recovered 26 Valium tablets from Snyder's pants pocket.

Initially, Massachusetts authorities charged Snyder under Mass. Gen. L. ch. 269, § 10(a) (1990) with unlawfully carrying a firearm, an offense punishable by a 2½–to–5–year prison term. When a federal grand jury later returned an indictment that charged Snyder with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (1994), Massachusetts dropped the state charge.

In due course, a federal trial jury found Snyder guilty. The probation office thereafter prepared a presentence investigation report (the PSI Report). The PSI Report indicated that Snyder's extensive criminal history rendered him subject to the sentencing enhancement provisions of the Armed Career Criminal Act, 18 U.S.C. § 924(e) (1994) (ACCA). Employing the corresponding sentencing guideline, USSG § 4B1.4 (Nov.1995), the PSI Report projected the guideline sentencing range (GSR) to be 262 to 327 months.

Judge Harrington conducted a three-day sentencing proceeding. On October 9, 1996, Snyder's counsel and the prosecutor sparred over Snyder's insistence that he was not subject to the ACCA because certain of his prior convictions did not qualify as predicate offenses thereunder. *See* 18 U.S.C. § 921(a)(20) (1994) (delineating various exclusions from the taxonomy of eligible predicate offenses). In the course of that hearing, Judge Harrington expressed reservations about the steepness of the projected sentencing range. Afterwards, he issued a memorandum that noted his "grave concern" with the "gross disparity" between the GSR and the punishment that Snyder would have received had state authorities pursued and obtained a conviction on the originally charged state offense. In that memorandum, the judge made no bones about his disdain for "the unfettered and unreviewable discretion of the United States Attorney" to prosecute in federal court the " 'local' offense of carrying a firearm." He concluded by scheduling a further hearing to address the issues "whether this disparity in sentences and the *de facto* selective prosecution of the defendant raise any constitutional concerns and whether the combination of the above two issues justify [sic] a downward departure under USSG § 5K2.0."

At the resumed hearing, held on December 12, 1996, Judge Harrington reiterated his belief that sentencing Snyder to a 21–year prison term would constitute a "gross violation of the principles of justice." Engaging in what some might consider wishful thinking, the judge then predicted the demise of the sentencing guidelines:

I said yesterday to the U.S. Attorney's Office, this type of de facto, selective prosecution continues. And when there is a disparity of over 20 years for the same offense, ... the guidelines are going to be dismantled because the federal judiciary will no longer, no longer put up with it. It's going to be dismantled.

Judge Harrington convened the third, and final, sentencing session on January 14, 1997. He ruled that Snyder fell within the ambit of the ACCA and that USSG § 4B1.4 therefore applied. He computed the GSR to be 235 to 293 months.[1] Judge Harrington then departed downward pursuant to USSG § 5K2.0 and sentenced Snyder to an incarcerative term of 180 months (the mandatory minimum under the ACCA). He premised the departure squarely on the ground that the federal/state sentencing disparity created by interleaved federal and state criminal jurisdiction over Snyder's conduct "is contrary to the very objective of and theory upon which the Guidelines are grounded and therefore takes this case out of the heartland and makes it atypical." *Snyder*, 954 F.Supp. at 22.[2] The sentencing court's rescript repeatedly condemns a system that cedes broad discretion to prosecutors to determine who will be charged federally—and, thus, exposed to potentially harsher sentences—when an offender's conduct violates both federal and state criminal codes. *See, e.g., id.* at 21 (disparaging "disparate sentencing treatment" brought about "by the exercise of absolute prosecutorial discretion"); *id.* at 22 ("For where unbridled power, unchecked by judicial scrutiny, can by fiat determine that a certain person from among many similarly situated shall serve such a disparate sentence for the same offense, then the balance of governmental powers has become distorted and the liberty of every individual is held hostage to the potential tyranny of the Executive Branch.").

## II. STANDARD OF REVIEW

■■■ We deal here only with the government's sentencing appeal.[3] We review a district court's decision to depart from the guideline sentencing range for abuse of discretion. *See Koon v. United States*, 518 U.S. 81, 96–100, 116 S.Ct. 2035, 2046–47, 135 L.Ed.2d 392 (1996). Our examination proceeds stepwise. First, we ascertain whether the guidelines permit the sentencing court's stated ground for departure. If so, we examine the record to discern the adequacy of the factual support that undergirds the departure. Finally, if the departure rests on satisfactory record support, we assess the reasonableness of its magnitude in light of the factual predicate. *See United States v. Dethlefs*, 123 F.3d 39, 43–44 (1st Cir.1997). Here, the government concedes that the departure decision stands or falls on the first prong of the test.

■■■ Whether the guidelines countenance a particular ground for departure is a question of law. *See Koon*, 518 U.S. at 98–100, 116 S.Ct. at 2047. While this legal question technically falls within *Koon*'s unitary abuse-of-discretion rubric, "[a] district court by definition abuses its discretion when it makes an error of law." *Id.* We determine the existence *vel non* of legal error without special deference to the sentencing court's views. *See United States v. Brennick*, 134 F.3d 10, 13 (1st Cir.1998).

---

1. The difference between the GSR projected in the PSI Report and that actually used stemmed from Judge Harrington's finding—not contested on appeal—that the government had not proven that Snyder committed an armed robbery. This finding shrunk Snyder's base offense level from 34 to 33, *see* USSG § 4B1.4(b)(3)(B), and effected a commensurate decrease in the GSR.

2. On appeal, Snyder attempts to divert our attention to alternative rationales that arguably support the downward departure. But Judge Harrington's decision makes no mention of such factors. To the contrary, he expressly stated that "[t]o this Court the issue raised is ... one of disparity between the sentences to be imposed." *Snyder*, 954 F.Supp. at 22. As our analysis must focus on the reasons given by the district court in support of a departure, we take no view of Snyder's post hoc justifications. *See United States v. Dethlefs*, 123 F.3d 39, 43 (1st Cir.1997); *United States v. Jackson*, 30 F.3d 199, 202 (1st Cir.1994).

3. Snyder appealed his conviction and his classification as an armed career criminal. We heretofore affirmed his conviction. *See United States v. Snyder*, No. 97–1187, 1998 WL 31434 (1st Cir. 1998) (unpublished).

## III. ANALYSIS

■ We turn now to the validity of the district court's stated ground for departure. The twin stanchions on which our analytic framework rests are the generic departure guideline, USSG § 5K2.0 (a guideline that flows directly from the congressional command embodied in 18 U.S.C. § 3553(b) (1994)) and the Court's opinion in *Koon*.

Section 5K2.0 permits a sentencing court to deviate from the range indicated by an otherwise applicable guideline computation if it finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." In considering whether an appropriate "aggravating or mitigating circumstance" exists, the court first must ask "[w]hat features of th[e] case, potentially, take it outside the Guidelines' 'heartland' and make of it a special, or unusual, case[.]" *Koon*, 518 U.S. at 95, 116 S.Ct. at 2045 (quoting *United States v. Rivera*, 994 F.2d 942, 949 (1st Cir.1993)). Judge Harrington believed that he had identified such a feature. In his view, the disparity between the sentence that Snyder would have received if convicted under Massachusetts law and the sentence mandated by USSG § 4B1.4 was a mitigating circumstance that brought Snyder's case outside the heartland of armed career criminal cases and justified a downward departure. *See Snyder*, 954 F.Supp. at 22. It falls to us to test this conclusion.

In mounting this inquiry, we do not write on a pristine page. Although the Sentencing Commission does not expressly proscribe federal/state sentencing disparity departures, five federal appellate courts have taken the measure of such departures. All have held that federal/state sentencing disparity is never a valid basis for a downward departure. *See United States v. Searcy*, 132 F.3d 1421, 1422 (11th Cir.1998); *United States v. Deitz*, 991 F.2d 443, 447–48 (8th Cir.1993); *United States v. Haynes*, 985 F.2d 65, 69–70 (2d Cir.1993); *United States v. Sitton*, 968 F.2d 947, 962 (9th Cir.1992); *United States v. Dockery*, 965 F.2d 1112, 1117–18 (D.C.Cir.

1992). This impressive array of authority resists ready rejection.

Snyder harps on two facts: most of these decisions predate *Koon*,[4] and federal judges are less free under the *Koon* regime to exorcise specific factors from the departure calculus. *See Koon*, 518 U.S. at 107–09, 116 S.Ct. at 2051; *Dethlefs*, 123 F.3d at 46. That rejoinder is true as far as it goes—but it does not go very far. We are, of course, respectful of the change in emphasis that *Koon* betokens. Still, "[n]otwithstanding that most categorical interpretations are disfavored under the *Koon* Court's regime, some boundaries are essential if the guidelines are not to be emptied of all meaning." *Dethlefs*, 123 F.3d at 47. So viewed, the pivotal question reduces to whether federal/state disparity trenches upon such an essential boundary.

The letter of the sentencing guidelines is unhelpful in this instance. Departures based on federal/state sentencing disparity are not expressly permitted or forbidden in the guidelines' text, nor are they explicitly encouraged or discouraged. As a result, we must mull the "structure and theory of both relevant individual guidelines and the Guidelines taken as a whole," *Koon*, 518 U.S. at 96, 116 S.Ct. at 2045 (quoting *Rivera*, 994 F.2d at 949), in our effort to ascertain whether this factor conceivably may be of a kind, or present to a degree, inadequately considered by the Commission (and thus capable of removing a particular case from the "heartland" sculpted by a given guideline), *see United States v. Clase–Espinal*, 115 F.3d 1054, 1057 (1st Cir.1997). Relevant federal statutes, the guidelines themselves, their accompanying official commentary and policy statements, and the case law inform our inquiry. *See id.* So too does our expectation that such categorical bans will be relatively rare.

The Commission's enabling statute directs it to "establish sentencing policies and practices for the Federal criminal justice system that ... avoid[ ] unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct...." 28 U.S.C. § 991(b)(1)(B) (1994); *see also* USSG Ch.1,

---

4. The lone exception is *Searcy,* a case decided after this case was briefed and argued.

Pt.A, intro. comment. 3. The legislative history makes it crystal clear that Congress's allusion to "unwarranted sentencing disparities" reflected a concern with variations among federal courts across the nation, without reference to their state counterparts. *See United States v. Aguilar–Pena*, 887 F.2d 347, 351–52 (1st Cir.1989). In terms, then, the guidelines seek to promote uniform sentencing among federal courts in respect to federal crimes. *See Deitz*, 991 F.2d at 447; *Sitton*, 968 F.2d at 962.

The trial judge sought to elongate this principle, speculating that "it would only be logical that Congress would not favor disparity throughout the criminal justice system in an era of increased Federal–State cooperation in the investigation and prosecution of crime." *Snyder*, 954 F.Supp. at 22. With respect, we think that elongating the principle in this way would destroy its structural integrity and, accordingly, that the trial judge's surmise is utterly inconsistent with the guidelines' theoretical underpinnings.

If the guidelines' goal is to promote uniformity among federal courts when imposing sentences for federal crimes, then departures aimed at alleviating federal/state sentencing disparity are flatly incompatible with it. Endeavoring to make a federal sentence more closely approximate that which a state court might impose for similar criminal activity would recreate the location-based sentencing swings that Congress sought to minimize when it opted for a guideline paradigm.[5] *See Searcy*, 132 F.3d at 1422; *Deitz*, 991 F.2d at 447–48; *see also Aguilar–Pena*, 887 F.2d at 352 (warning that departures cannot be allowed to subvert Congress's "ardent desire to dispense with inequalities based on localized sentencing responses").

The short of it is that the guidelines did not sprout in a vacuum. Congress and the Sentencing Commission erected the present sentencing structure against the skyline of an extant criminal justice system, *see Haynes*, 985 F.2d at 69; *Dockery*, 965 F.2d at 1117; *see also* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L.Rev. 1 (1988), and that system includes overlapping state and federal criminal jurisdiction. The fact that the states impose different and varied sentences for criminal conduct that may also transgress federal law is about as obvious as a hippopotamus at a tea party. It is implausible to suppose that the Commission overlooked this large reality and therefore failed to account for it in formulating the guidelines.[6] *See Dethlefs*, 123 F.3d at 47; *Clase–Espinal*, 115 F.3d at 1057.

We add, moreover, that disparity between federal and state sentences in career offender cases is hardly serendipitous. Congress crafted the ACCA on the central premise that armed career criminals were being treated too gently by state courts—coddled, some might say—and that these defendants ought to receive much stiffer sentences. *See United States v. Jackson*, 30 F.3d 199, 204 (1st Cir.1994); *see also* 18 U.S.C. § 924(e); H.R.Rep. No. 98–1073, at 5 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3661, 3665; USSG § 4B1.4, comment. (backg'd.). For these defendants, significant disparity between sentences at the federal and state levels is the rule, not the exception. Hence, if Snyder is entitled to a downward departure on this basis, then virtually every defendant subject to the ACCA is similarly entitled. *See Dockery*, 965 F.2d at 1118.

---

**5.** One Commission member illustrated the swings that occurred in the pre-guidelines era by recounting the following findings:

> The region in which the defendant is convicted is likely to change the length of time served from approximately six months more if one is sentenced in the South to twelve months less if one is sentenced in central California.... [B]lack [bank robbery] defendants convicted ... in the South are likely to actually serve approximately thirteen months longer than similarly situated bank robbers convicted ... in other regions.

Hearings on Sentencing Guidelines Before the Subcomm. on Criminal Justice of the House Comm. on the Judiciary, 100th Cong., 1st Sess. 554, 676–77 (1987) (testimony of Commissioner Ilene H. Nagel).

**6.** We think it unremarkable that the Commission has not expressly forbidden federal/state disparity departures. Given that the guidelines were never intended to foster parity between federal and state defendants, Commission commentary on the subject would be supererogatory.

■ We are equally unimpressed with the district court's attempt to hang its finding of atypicality on an aversion to federal prosecutors' discretionary power to target defendants under federal law. *See Snyder*, 954 F.Supp. at 22. Different branches of government have different responsibilities, and the power to determine when to prosecute and when to refrain is, within broad limits, a prerogative of the Executive Branch. Accordingly, it is a "bedrock principle of our system of criminal justice" that a federal judge may not interfere with the government's prosecutorial decisions solely to vindicate his subjective view of the wisdom of a given enforcement strategy. *United States v. Stokes*, 124 F.3d 39, 46 (1st Cir.1997). It follows inexorably that the government's lawful selection of Snyder for federal prosecution has no relevance to the sentencing inquiry.[7]

For these reasons, we hold that federal/state sentencing disparity is not a feature that can justify a departure. Such departures would contradict hopelessly the guidelines' structure and theory as well as impinge impermissibly upon the Executive Branch's discretion to prosecute defendants under federal law. *See Dockery*, 965 F.2d at 1118.

■ We add a coda. The continuing federalization of criminal law increases the frequency with which federal/state sentencing disparities occur, *see generally* Steven D. Clymer, *Unequal Justice: The Federalization of Criminal Law*, 70 S. Cal. L.Rev. 643 (1997), and we are not entirely unsympathetic to Judge Harrington's concerns about this trend. Still, judicial dissatisfaction with a particular aspect of the guidelines, "no matter how steeped in real-world wisdom, cannot be enough to trigger departures." *Aguilar–Pena*, 887 F.2d at 353; *see also United States v. Muniz*, 49 F.3d 36, 43 (1st Cir. 1995); *United States v. Norflett*, 922 F.2d 50, 54 (1st Cir.1990). As long as federal and state sovereigns share jurisdiction over criminal matters, prosecutors will be able to expose selected defendants to elevated sentences. One can envision models designed to eliminate or minimize this circumstance, *see generally* Sara Sun Beale, *Too Many and Yet Too Few: New Principles to Define the Proper Limits for Federal Criminal Jurisdiction*, 46 Hastings L.J. 979 (1995), but these models reflect structure and theory quite different from that embodied in the federal sentencing guidelines. Thus, the case for them must be made in Congress, not in the courts.

## IV. CONCLUSION

In sum, federal/state sentencing disparity is not "a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). Hence, we vacate Snyder's sentence and remand for resentencing.

We close by addressing one further point. In our companion opinion, *see supra* note 3, we approved for the time being the district court's adherence to *United States v. Estrella*, 104 F.3d 3 (1st Cir.1997), and rejected Snyder's contention that 18 U.S.C. § 921(a)(20) prevents his prior Massachusetts convictions from bringing him within the fold of the ACCA. We noted, however, that the Supreme Court recently granted certiorari to review this court's unpublished opinion in *Caron v. United States*, Nos. 96–2338, 2339 (1st Cir. May 9, 1997), *cert. granted*, —— U.S. ——, 118 S.Ct. 680, 139 L.Ed.2d 628 (1998), and prophesied that the Court's review of *Caron* will encompass the relevant aspects of *Estrella*. Consequently, if the defendant consents, the district court may choose to delay resentencing pending the resolution of *Caron*. Elsewise, the district court should impose sentence consistent herewith, applying *Estrella*, but reserve to Snyder the right to seek reconsideration should the *Caron* Court's decision materially affect the sentence imposed.

*Vacated and remanded.*

---

7. We find no record evidence of an unconstitutional exercise of prosecutorial authority in this case. We note, moreover, that Judge Harrington himself ruled in an unpublished order dated December 27, 1997, that Snyder had failed to make out a prima facie case of selective prosecution.