# United States Court of Appeals
## For the First Circuit

---

Nos. 00-1043, 00-1051

UNITED STATES OF AMERICA,

Appellee,

v.

ERIC GRAY SNYDER,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

---

Before

Boudin, Circuit Judge,

Cyr, Senior Circuit Judge,

and Lynch, Circuit Judge.

---

Victoria L. Nadel for appellant.
James F. Lang, Assistant United States Attorney, with whom Donald
K. Stern, United States Attorney, was on brief, for appellee.

---

December 21, 2000

---

**LYNCH, <u>Circuit Judge</u>**.  In this unusual case, a trial judge <u>sua sponte</u> recused himself from sentencing because he found himself "unwilling, as a matter of conscience" to apply the U.S. Sentencing Guidelines as interpreted by this court. The defendant, who might have otherwise benefitted from the judge's lenient views, claims that the judge had a duty to sit, that his decision to recuse himself was therefore in error, and that the case should be remanded back to the judge for resentencing.  In the alternative, the defendant objects to the sentence imposed upon him by a different judge to whom his case was reassigned, as well as that judge's decision to deny his motion for a new trial.  The primary question in the case pits a judge's duty to sit, if there is no reason to recuse, against his duty not to sit, if a reasonable person could doubt his impartiality.  We uphold the trial judge's decision to recuse himself and reject the defendant's other attacks.

## I. BACKGROUND

Eric Snyder was convicted after a jury trial of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).  At sentencing, the trial judge, Judge Harrington, found the defendant to be an armed career criminal under 18 U.S.C. § 924(e) and calculated the applicable guideline range at 235 to 293 months.  However, after expressing concern during the sentencing hearing that

the range was too harsh, Judge Harrington chose to depart downward, explaining his decision in a published memorandum.  See United States v. Snyder, 954 F. Supp. 19, 22 (D. Mass. 1997) (hereinafter " Snyder I").  In his view, a downward departure was justified because had Snyder been prosecuted and convicted under state law, he would have been sentenced to a far shorter prison term than that prescribed by the federal Sentencing Guidelines.  Such sentencing disparity, Judge Harrington argued, effectively grants federal prosecutors "unbridled power" to single out "local" offenders for disparately long federal sentences.  Accordingly, Judge Harrington departed downward in order to bring Snyder's sentence closer to the sentence he would have received in state court, sentencing Snyder to 180 months, the statutory minimum. Id.  On appeal, this court vacated the sentence, holding that a disparity between federal and state sentences for the same offense is not a legitimate ground for departure.  We remanded the case for resentencing.  See United States v. Snyder, 136 F.3d 65, 70 (1st Cir. 1998) ("Snyder II").

Following the remand, Judge Harrington initially scheduled resentencing for April 27, 1998.  Over the next eight months, though, he granted Snyder a series of continuances while Snyder awaited a decision from the Boston Municipal Court regarding whether one of his prior convictions was unconstitutional. On December 9, 1998, after successfully vacating the prior conviction, Snyder moved for a new

-3-

trial in this case, arguing that with the conviction eliminated he could no longer be considered to have been a "felon" for purposes of § 922(g)(1) at the time he was caught in possession of a firearm.

On December 23, 1998, Judge Harrington held a hearing in which he considered both Snyder's resentencing and his motion for a new trial. During the hearing, the judge made clear that he harbored "deep problems of conscience over this case" and that he was frustrated by the government's unwillingness to concede that Snyder did not deserve the sentence required by the Guidelines. The hearing produced no resolution as Judge Harrington again granted a continuance, this time to allow Snyder to submit his own version of events for inclusion in the presentence report.

On September 22, 1999, a year and a half after our remand in Snyder II, Judge Harrington abruptly recused himself from the case sua sponte. The written order stated that he was "unwilling, as a matter of conscience, to impose the draconian sentence required by the United States Court of Appeals for the First Circuit," citing Snyder I as setting forth the reasons underlying his conscientious objection. Snyder moved for reconsideration of the recusal order, which motion Judge Harrington denied by margin endorsement. Snyder then appealed the denial.

While the appeal was pending, Snyder's case was reassigned to Chief Judge Young, who proceeded to hold a sentencing hearing on

-4-

October 14, 1999.  At the hearing, Judge Young denied a motion by Snyder for further continuance pending this court's decision on Judge Harrington's recusal.  He then heard Snyder argue various grounds for a downward departure.  Rejecting all of those grounds, Judge Young sentenced Snyder to 264 months, a sentence at the midpoint of the applicable guideline range.  On March 6, 2000, Judge Young denied Snyder's motion for a new trial. Snyder timely appealed his sentence and the denial of the new trial motion.  We now consider this appeal and the appeal of Judge Harrington's recusal order.

## II. DISCUSSION

### A.  Recusal

Did Judge Harrington commit reversible error in recusing himself from the case?  Snyder claims that Judge Harrington lacked any valid authority for recusing himself, and that in the absence of such authority the judge had a duty to continue presiding.  As for what prejudice Snyder suffered from the recusal, he claims that he was deprived of the opportunity to be sentenced by a judge intimately familiar with the facts of his case.  Had the sentencing judge fully grasped these supposedly peculiar facts, Snyder believes, he would have granted Snyder a downward departure or, at the very least, would have sentenced Snyder at the low end, rather than the midpoint, of the applicable guideline range.  For its part, the government argues that Judge Harrington's decision to recuse himself was entirely

appropriate under the circumstances: the judge had made many statements of record expressing hostility toward the government's case, and for some 18 months he had refused to sentence Snyder as he was required to do on remand. Such conduct, the government argues, gave rise to an objective appearance of partiality, warranting recusal.

Recusal of federal judges is governed by 28 U.S.C. § 455, subsection (a) of which is at issue here. That subsection provides that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The reach of the subsection is broad. It forbids partiality whether grounded in an "interest or relationship" or a "bias or prejudice"; and it forbids not only the reality of partiality but its objective appearance as well. Liteky v. United States, 510 U.S. 540, 548 (1994). As the Supreme Court has pithily characterized the subsection: "Quite simply and quite universally, recusal [i]s required whenever 'impartiality might reasonably be questioned.'" Id. (quoting 28 U.S.C. § 455(a)).

Nevertheless, judges are not to recuse themselves lightly under § 455(a). See H.R. Rep. No. 93-1453, at 5 (1974), reprinted in 1974 U.S.C.C.A.N. 6351, 6355 ("[Section 455(a)] should not be used by judges to avoid sitting on difficult or controversial cases."). As Snyder contends, an erroneous recusal may be prejudicial in some

-6-

circumstances.  See United States v. Arache, 946 F.2d 129, 140 (1st Cir. 1991) (finding that "there appears to be some force" to argument that recusal may prejudice defendant where recusing judge has become familiar enough with facts of case to question reliability of key testimony).  In any event, the unnecessary transfer of a case from one judge to another is inherently inefficient and delays the administration of justice.  See Camacho v. Autoridad de Telefonos de Puerto Rico, 868 F.2d 482, 491 (1st Cir. 1989) (noting that the judicial system would be "paralyzed" were standards for recusal too low).  For these reasons, "[a] trial judge must hear cases unless [there is] some reasonable factual basis to doubt the impartiality or fairness of the tribunal."  Blizard v. Frechette, 601 F.2d 1217, 1221 (1st Cir. 1979).  Thus, under § 455(a) a judge has a duty to recuse himself if his impartiality can reasonably be questioned; but otherwise, he has a duty to sit.[1]

Most appeals arising under § 455(a) are brought after the trial judge has refused to recuse himself on motion of a party.  See, e.g., In re United States, 158 F.3d 26, 27 (1st Cir. 1998); Blizard,

_____

[1]    Section 455(a) modified, but did not eliminate, the duty to sit doctrine.  See In re Martinez-Catala, 129 F.3d 213, 221 (1st Cir. 1997).  The duty to sit doctrine originally not only required a judge to sit in the absence of any reason to recuse, but also required a judge to resolve close cases in favor of sitting rather than recusing. Section 455(a) eliminated the latter element of the doctrine, Blizard, 601 F.2d at 1220, but not the former, id. at 1221.  "In this sense, i.e., that judges hear cases unless there is some reason not to, the 'duty to sit' remains."  Id.

-7-

601 F.2d at 1219.[2]  In such cases we have applied an abuse of discretion standard.  As we stated in In re United States:

> [A] decision whether to disqualify [is] in the first instance committed to the district judge.  And, since in many cases reasonable deciders may disagree, the district judge is allowed a range of discretion.  The appellate court, therefore, must ask itself not whether it would have decided as did the trial court, but whether that decision cannot be defended as a rational conclusion supported by [a] reasonable reading of the record.

158 F.3d at 30 (citations and internal quotation marks omitted). Furthermore, we have recognized that the duty to recuse and the duty to sit do not exert equal pull; in close cases, "doubts ordinarily ought to be resolved in favor of recusal." Id.  No one suggests that different principles of review apply here, where a judge has recused himself sua sponte.[3]  Hence, our review in this case, as in our prior cases, is both deferential and weighted: we inquire whether, in light of the policy favoring recusal in close cases, Judge Harrington abused his discretion in finding that he had a duty to recuse himself.

---

[2]     Rarely, we have found that a judge erred by recusing himself, rather than by refusing to do so. El Fenix de Puerto Rico v. The M/Y Johanny, 36 F.3d 136, 140 (1st Cir. 1994); cf. United States v. Arache, 946 F.2d at 140 (considering defendant's (waived) claim that judge should not have recused himself but finding no plain error).

[3]     Perhaps the most famed example of spontaneous recusal is that of Justice Frankfurter, a self-described victim of bus background music, in a case challenging the broadcasting of such music on city buses. Public Utils. Comm'n v. Pollak, 343 U.S. 451, 466-67 (1952) (Frankfurter, J., recusal opinion).

We find no such abuse of discretion. Given Judge Harrington's persistent and vociferous objections to Snyder's federal prosecution, and, more importantly, given his outright unwillingness to sentence Snyder in accordance with this court's ruling in Snyder II, Judge Harrington's decision to recuse himself from the case was clearly not an abuse of discretion. Judge Harrington did not merely express opinion; he ultimately concluded he could not bring himself to do what the law required. The record amply evinces that his conclusion was genuine. Further, to the extent there can be any doubt, such doubt is resolved in favor of recusal.

Judge Harrington first voiced objections to Snyder's prosecution in the sentencing proceedings antedating Snyder II, in which he repeatedly insisted that Snyder's federal prosecution worked a "gross violation of the principles of justice." In his memorandum in Snyder I, Judge Harrington elaborated on this theme, holding that the sentence sought by the government

> constitutes a grossly disparate sentence pre-determined by the prosecutor in the exercise of his absolute discretion and, thus, affronts this Court's sense of fundamental fairness . . . . For where unbridled power, unchecked by judicial scrutiny, can by fiat determine that a certain person from among many similarly situated shall serve such a disparate sentence for the same offense, then the balance of governmental powers has become distorted and the liberty of every individual is held hostage to the potential tyranny of the Executive Branch.

Snyder I, 954 F. Supp. at 22; see also Snyder II, 136 F.3d at 66-67

(detailing Judge Harrington's remarks in sentencing proceedings antedating Snyder II).

On remand following Snyder II, at the aborted sentencing hearing of December 23, 1998, Judge Harrington's protests grew increasingly adamant. He again and again chastised the government for requesting a 262-month sentence:

> How does . . . the government, in an insignificant incident, . . . ask me to sentence this man to 21 years? I've been involved in a lot of murder cases and I never had a client who ever did more actual jail time than 15 years. And I'll tell you, it shocks me that the United States Government would look at this man for what he did in this case and ask for 21 years. I think it's unjust and it's extremely shocking, and I just can't believe that this government, of which we're all a part, can do it. It's a manifestation of inflexibility on their part.
>
> . . . .
>
> I don't endorse what Mr. Snyder did, but I've been involved in the criminal law for 38 years on both sides. To my judgment, this is the most outrageous recommendation I have ever seen in the history of Massachusetts jurisprudence . . . . And every time I think of Mr. Snyder having to serve 21 years, I almost get physically sick.

As the hearing progressed, Judge Harrington returned to the objections he lodged in Snyder I concerning the judiciary's inability to check selective prosecution and sentencing, even though this court had instructed (as Judge Harrington apparently recognized) that those objections were not legitimate grounds for a downward departure:

> This case is an example, although the Court of Appeals did not accept it, of the government using a Federal Court to transform a year-and-a-half sentence to a 21-year term of imprisonment.
>
> . . . .
>
> And federal judges feel put upon because they feel that that type of sentence is unjust.

Toward the end of the hearing, Judge Harrington openly expressed frustration with the prosecution's refusal to come around to the court's point of view, at one point pressing the government to concede that Snyder was entitled to some sort of downward departure. Specifically, after describing the court's efforts to cooperate with the U.S. Attorney's office in other matters, Judge Harrington continued:

> And yet now, when this Court -- when the U.S. Attorney knows that this Court has deep problems of conscience over this case, they will not reciprocate one inch, one inch.

Finally, in the recusal order issued after the hearing, Judge Harrington expressly declared that he was flatly unwilling to sentence Snyder in accordance with this court's remand order, reasserting, once again, the objections articulated in <u>Snyder I</u>.

A judge's views on matters of law and policy ordinarily are not legitimate grounds for recusal, even if such views are strongly held. <u>See</u> Richard E. Flamm, <u>Judicial Disqualification: Recusal and Disqualification of Judges</u> § 10.2 (1996) (collecting cases). After all, judges commonly come to a case with personal

-11-

views on the underlying subject matter; indeed, many judges are known to dislike aspects of the Sentencing Guidelines. Far from necessarily warranting recusal, typically such views merely mark an active mind. See Laird v. Tatum, 409 U.S. 824, 835 (1972) ("Proof that a [judge's] mind . . . was a complete tabula rasa . . . would be evidence of lack of qualification, not lack of bias."); John Leubsdorf, Theories of Judging and Judge Disqualification, 62 N.Y.U. L. Rev. 237, 250-51 (1987) (discussing Judge Jerome Frank's statement that "[i]f . . . bias and partiality be defined to mean the total absence of preconceptions in the mind of the judge, then no one has ever had a fair trial and no one ever will").

Moreover, a judge ordinarily may not be disqualified merely for reprehending a party's legal position, or for interrogating counsel in an angry or confrontational tone. See In re United States, 158 F.3d at 34; Flamm, supra, § 16.5. Emotions can run high in the courtroom, and occasional flares of temper are to be expected in the heat of argument.

But when a judge proves unable to put aside his personal convictions in order to carry out the law, when his hostility toward a litigant's position has become so pervasive that he cannot reasonably hope to provide a fair hearing, then recusal is of course warranted. See Flamm, supra, § 10.4 (recusal appropriate where judge's mind has become "irrevocably closed" as to the issues in a

specific case) (collecting cases); <u>In re United States</u>, 158 F.3d at 34 (recusal appropriate where judge appears to harbor "an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute") (quoting <u>Liteky</u>, 510 U.S. at 557-58 (Kennedy, J., concurring in the judgment)).  These conditions clearly enough were met here.  <u>Cf.</u> <u>City of Columbus</u> v. <u>Hayes</u>, 587 N.E.2d 939, 942  (Oh. Ct. App. 1990) (remanding to another judge for resentencing where original sentencing judge, after being reversed, declared that he would impose the same sentence as before, even if he were reversed again "ten times").  At the least, we find that Judge Harrington did not abuse his discretion in deciding that, given his unyielding antipathy toward the government's case, he had no choice but to recuse himself.

That said, there is another point.  While one can appreciate the struggle of a judge to bring himself to apply a law he feels unjust, that this process took over a year and a half in this case is cause for concern.  The defendant and the government each had interests in ensuring that facts relevant to sentencing remained fresh in the mind of the court, counsel, and any potential witnesses. The public also legitimately expects that criminal cases will be expeditiously resolved.  Thus, while we hold that Judge Harrington's decision to recuse himself was not in error, we note that a prompter decision would have better served the interests of justice.

-13-

**B. Sentencing**

The next question is whether Judge Young erred in resentencing Snyder. Snyder alleges two errors: first, he claims Judge Young failed to explain why he saw fit to sentence Snyder at the midpoint, rather than the low end, of the applicable guideline range; second, he claims that Judge Young failed adequately to consider various grounds for departure and consequently failed to depart downward from the applicable guideline range.

Snyder's first claim is based on 18 U.S.C. § 3553(c), which requires the sentencing court to explain how it determined the applicable guideline range and, if that range exceeds twenty-four months, why it selected the particular point that it did within that range. Snyder challenges the second aspect of Judge Young's calculation of his sentence, arguing that the judge's decision to sentence Snyder at the midpoint of the applicable guideline range was arbitrary and unjustified by the facts of the case.[4]

---

[4]    Although not contested here, the applicable guideline range has been a matter of some dispute in the case. In <u>Snyder I</u>, Judge Harrington found that Snyder had not committed armed robbery with the handgun he was convicted of possessing, contrary to the government's contention. Consequently, his offense level was set at 33 rather than 34, and the applicable guideline range was determined to be 235 to 293 months rather than 262 to 327 months. <u>See</u> 954 F. Supp. at 21. At resentencing, Judge Young was initially inclined to find that Synder had in fact committed armed robbery with the handgun, but deferred to Judge Harrington's finding, which was not appealed in <u>Snyder I</u>, as the law of the case. The government does not attempt to appeal this aspect of Judge Young's sentencing decision here.

-14-

The record of the sentencing hearing reveals that Judge Young adequately explained his decision to sentence Snyder at the midpoint of the applicable guideline range. The government argued exhaustively for such a sentence, based on the grounds that: (1) Snyder had used the firearm underlying his § 922(g)(1) conviction in an armed robbery on January 10, 1995; (2) pursuant to the arrest for the armed robbery, the firearm was found in the trunk of a car along with a ski mask and duct tape, indicating Snyder intended to use the firearm for future unlawful conduct; and (3) Snyder had a criminal record considerably more serious than the minimum necessary to trigger the applicable guideline range. While Judge Young chose to defer to Judge Harrington's finding that Snyder had not committed the armed robbery of January 10, see note 4 supra, he ultimately agreed with the government's recommendation based on the other two grounds it proffered:

> This case seems to be a quintessential case for the imposition of the penalty that the Congress has required to be imposed.
>
> . . . .
>
> [T]he record of crimes of violence here, the setting which I find supported by the facts, the finding of the mask and duct tape with the weapon, the evidence . . . amply justifies the inference that this weapon was being carried . . . for the purpose of aiding and abetting another felony, [and] against this background justifies the sentence of the Court.

In context, the court's explanation was sufficiently specific to meet

the requirements of § 3553(c).

Snyder's second claim is that Judge Young erred in declining to depart downward. Specifically, Snyder argues that Judge Young failed to give adequate consideration to four potential grounds for downward departure: (1) Snyder's conviction rested on an erroneous jury instruction; (2) the government improperly paid a key witness in exchange for his testimony; (3) there was no compelling federal interest in prosecuting Snyder's "local" offense; and (4) Snyder's criminal history category overstated the seriousness of his criminal past. All of the asserted grounds are meritless.

The first two asserted grounds are insufficient for departure as a matter of law. Snyder invokes U.S.S.G. § 5K2.0, which grants a judge discretion to depart downward if "there exists . . . [a] mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." But the invocation comes up short. Even assuming Snyder's conviction rested on an erroneous jury instruction and the testimony of an unlawfully compensated witness,[5] Snyder has entirely failed to explain how

---

[5] While we need not reach the issue, we note that the government did not unlawfully compensate any witness in this case. As a general matter, promises of leniency or material assistance given by the government in exchange for a witness's testimony do not violate federal bribery laws. United States v. Lara, 181 F.3d 183, 198 (1st Cir.), cert. denied, 528 U.S. 979 (1999). We have acknowledged that "there are surely outer limits on what a prosecutor can do in offering benefits to a witness," United States v. Murphy, 193 F.3d 1, 9 (1st Cir. 1999); but the defendant offers no support for his assertion that

-16-

either factor is relevant to sentencing.  He does not claim, for example, that the government paid a witness to testify so as to exaggerate certain features of his offense, in an attempt at manipulating his sentence.  Cf. United States v. Montoya, 62 F.3d 1, 3-4 (1st Cir. 1995).[6]

Rather, Snyder's claim seems to rest on the view that a trial error or prosecutorial misdeed in and of itself permits downward departure.  Such a view, however, misconceives § 5K2.0 as though it were an alternative avenue for post-conviction relief.  If Snyder did in fact suffer a faulty trial or tainted prosecution, he may properly seek to vacate his conviction, but not to shorten his sentence.  The district court correctly arrived at the same conclusion with respect to the jury instruction issue:

> I . . . as an institutional matter reject the argument that some alleged misstep in the trial warrants a lower sentence.  That's not the way to proceed.  But if there has been, I'll address that in the petition for habeas

the compensation provided here -- housing, modest subsistence payments, help in securing lenient dispositions of pending state court cases -- approached these outer limits.

[6]     Indeed, the testimony that Snyder claims to have been the object of a government bribe was that Snyder had committed an armed robbery with the firearm underlying his conviction.  But this testimony had no impact on Snyder's sentence.  Judge Harrington explicitly found the testimony not to be credible for purposes of sentencing, see Snyder I, 954 F. Supp. at 21, and Judge Young deferred to this finding at resentencing, see supra note 4.

corpus.[7]

Only in those rare cases where a procedural flaw raises concerns of particular relevance to sentencing -- as opposed to mere concerns about the propriety of the defendant's conviction -- may downward departure be warranted under § 5K2.0.  See United States v. Crippen, 961 F.2d 882, 885 (9th Cir. 1992) ("for a factor to be considered [mitigating], it must be tied to some penological purpose or legitimate sentencing concern" (emphasis in original)); cf. United States v. Martinez, 136 F.3d 972, 979-80 (4th Cir. 1998) (finding ineffective assistance of counsel by itself to be irrelevant to sentencing); Crippen, 961 F.2d at 885 (same).  The same is true as to prosecutorial misconduct.  Compare United States v. Valencia-Lucena, 925 F.2d 506, 515 (1st Cir. 1991) (stating general rule that "[a] sentencing departure is not warranted in response to conduct of the government . . . ."), with Montoya, 62 F.3d 1, 4-5 (recognizing that departure may be warranted in the "extreme and unusual case" where government has engaged in "sentencing factor manipulation").[8]

---

[7]     As to Snyder's witness compensation claim, the district court simply remarked that the claim had no relevance to sentencing.

[8]     In United States v. Rowe, 202 F.3d 37 (1st Cir. 2000), we questioned whether Valencia-Lucena remains good law in the wake of Koon v. United States, 518 U.S. 81 (1996).  See 202 F.3d at 40-41.  Koon generally discourages courts from categorically refusing to consider certain factors under § 5K2.0, see 518 U.S. at 94, and so certainly would disfavor a rule categorically disqualifying government misconduct as a potential ground for departure.  But here, we adopt no such rule. We merely state the obvious: government misconduct may serve as a

Snyder's third asserted ground for departure -- the supposed lack of any compelling federal interest to justify his federal prosecution -- is likewise flawed as a matter of law. It is not a _compelling_ federal interest, but merely a federal interest, that is required to justify a defendant's federal prosecution. Here, such interest is supplied by the Commerce Clause. See United States v. Cardoza, 129 F.3d 6, 10-11 (1st Cir. 1997). Snyder concedes that § 922(g)(1) is constitutionally valid and that it provided sufficient legal authority for his federal prosecution. He nonetheless insists that his offense was purely "local," that the federal government's sole motive in prosecuting him was to lengthen his prison time by way of the Sentencing Guidelines, and that in such circumstances, § 5K2.0 allows a judge to depart downward in order to check the government's intemperate -- albeit legal -- use of its prosecutorial discretion. We rejected this very argument in Snyder II:

> [I]t is a bedrock principle of our system of criminal justice that a federal judge may not interfere with the government's prosecutorial decisions solely to vindicate his subjective view of the wisdom of a given enforcement strategy. It follows inexorably that the government's lawful selection of Snyder for federal prosecution has no relevance to the sentencing inquiry.

136 F.3d at 70 (internal quotation marks and citations omitted). The

ground for departure, but only if relevant in some particular way to sentencing. See United States v. Dethlefs, 123 F.3d 39, 47 (1st Cir. 1997) ("Notwithstanding that most categorical interpretations are disfavored under the Koon Court's regime, some boundaries are essential if the guidelines are not to be emptied of all meaning.")

-19-

district court thus committed no error in refusing to consider the wisdom of Snyder's prosecution as a ground for departure.

Fourthly, Snyder asserts that his criminal history category overstates the seriousness of his prior criminal record, warranting a downward departure pursuant to U.S.S.G. § 4A1.3. Snyder concedes that his record includes numerous convictions, but he emphasizes their vintage. His last violent felony conviction, he claims, was in 1984; his subsequent offenses he deems "minor."[9]

A district court is entitled to depart on such ground, but the refusal to depart is not reviewable at all unless the district court mistakenly believed that it lacked such authority. Snyder contends that Judge Young misunderstood his argument to be that he had undergone "extraordinary rehabilitation"; as a result, Snyder says, Judge Young failed to appreciate that he was being asked to depart under § 4A1.3, and that he had the authority to so depart. But while Judge Young did state that he rejected "the argument that

_____

[9]      This characterization is, to put it mildly, not entirely honest. Snyder was in jail for most of the time from 1984 until his arrest in this case in 1995, which obviously limited his opportunities for criminal conduct. Moreover, when Snyder was out on parole, he was found guilty in 1990 of selling heroin, arrested in 1991 for assault and battery upon a police officer, convicted in 1992 of stalking a woman who had a restraining order against him, and arrested again in 1992 for robbery -- all hardly "minor" crimes. Finally, it is worth noting that Snyder was assigned 20 criminal history points in his pre-sentencing report; a mere 13 would have been sufficient to place Snyder in his criminal history category of VI. It is little wonder that the trial court was not impressed with this argument.

there has been extraordinary rehabilitation," the context makes clear that this characterization was simply a gloss he put on the argument. As the judge later stated: "The record of crimes of violence here . . . justifies the sentence of the Court." There is thus no reason to believe that Judge Young misunderstood his authority to depart under § 4A1.3.

## C. Motion for New Trial

Snyder lastly appeals the district court's denial of his motion for a new trial. The motion was based on his successful collateral attack in 1998 of his 1992 stalking conviction.[10] The essence of Snyder's argument is that even though the stalking conviction was still valid when he was found in possession of a firearm in 1995, the conviction can no longer serve as a predicate for his § 922(g)(1) offense now that it has been vacated. And because all of his other convictions are also problematic as predicates -- or so he claims[11] -- Snyder argues he must be awarded a

---

[10] The attack was based on Commonwealth v. Kwiatkowski, 637 N.E.2d 854 (Mass. 1994), in which the Massachusetts Supreme Judicial Court held that, as a constitutional matter, a certain Massachusetts stalking statute had to be interpreted so as to require at least three incidents of harassing the victim. Id. at 858. Snyder apparently had engaged in several such incidents, but only one occurred after the effective date of the statute.

[11] Snyder claims that until the Supreme Court's 1998 decision in United States v. Caron, 524 U.S. 308 (1998), it was not clear whether his older Massachusetts convictions could serve as predicates, and therefore the convictions were problematic as predicates at the time of his indictment. Because we find that, in any event, Snyder's

-21-

new trial so that he may be given the opportunity to argue that he was not a "felon" for purposes of § 922(g)(1) at the time he was caught possessing a firearm.

Snyder's argument runs directly contrary to the Supreme Court's decision in Lewis v. United States, 445 U.S. 55 (1980). In that case, the Court considered whether a successful collateral attack on a prior felony conviction means that the conviction may no longer serve as a predicate for purposes of 18 U.S.C. § 1202(a)(1), a predecessor to § 922(g)(1). The Court held that under § 1202(a)(1) "a felony conviction imposes a firearm disability until the conviction is vacated or the felon is relieved of his disability by some affirmative action, such as a qualifying pardon or a consent from the Secretary of the Treasury." Id. at 60-61. The Court went on to state that "Congress clearly intended that the defendant clear his [felon] status before obtaining a firearm." Id. at 64 (emphasis in original). Thus it concluded that "§ 1202(a)(1) prohibits a felon from possessing a firearm despite the fact that the predicate felony may be subject to collateral attack on constitutional grounds." Id. at 65. Moreover, the Court specifically found "little significant difference" between § 1202(a)(1) and § 922(g)(1) in this regard. Id. ("[T]o limit the scope of §§ 922(g)(1) and (h)(1) to a validly

_____

stalking conviction was valid as a predicate, we do not address this second argument.

-22-

convicted felon would be at odds with the statutory scheme as a whole.").

Snyder points to cases where a defendant has been sentenced under § 924(e), the Armed Career Criminal Act, which imposes a 15-year mandatory minimum if the defendant has three prior violent felony convictions. As to those cases, we have held that the defendant is entitled to resentencing upon eliminating a necessary predicate conviction in support of the sentence -- even if the conviction was still valid at the time the sentence was imposed. Snyder argues by analogy that if in such circumstances "an enhanced sentence must be vacated, certainly a conviction must be vacated as well."

Some support for this argument might be thought to come from our decision in United States v. Pettiford, 101 F.3d 199 (1st Cir. 1996), a case construing § 921(a)(20), which defines what counts as a predicate conviction for the purposes of both § 922(g)(1) and § 924(e). Though not mentioned in our decision, § 921(a)(20) had by that time been amended in 1986 -- after Lewis was decided -- to provide that "[a]ny conviction which has been expunged . . . shall not be considered a conviction for purposes of this chapter . . . ." 18 U.S.C. § 921(a)(20)(B). We held, without mentioning Lewis, that the section could be read to exclude convictions valid at the time of sentencing but expunged subsequently. See id. at 201.

-23-

However, <u>Pettiford</u> was a sentencing case and its holding must be read in that context.  <u>Pettiford</u> merely holds that a conviction expunged after sentencing can no longer serve as a predicate for a § 924(e) sentencing enhancement.  It does not hold that a conviction expunged after a § 922(g)(1) offense can no longer serve as a predicate for that offense.  The two situations call for differential treatment.  As we noted in <u>United States</u> v. <u>Paleo</u>, 9 F.3d 988 (1st Cir. 1992), the federal gun laws, such as 922(g)(1), reflect "the desirability of having a clear, bright line in respect to gun possession: one who has a felony conviction on the books, a conviction not yet set aside, should simply know not to possess a gun."  <u>Id.</u> at 989.  By contrast, we saw no rationale for a bright-line rule with respect to § 924(e), so we found it appropriate to treat vacated convictions differently for purposes of that section.  See <u>id.</u>  We recognized an important distinction: "<u>Lewis</u> is inapplicable where prior convictions are used to determine the punishment, rather than to define the offense."  <u>Id.</u> (quoting <u>United States</u> v. <u>Clawson</u>, 831 F.2d 909, 914-15 (9th Cir. 1987)).  <u>Pettiford</u> goes no further than this.  Because prior convictions are used to define § 922(g)(1), <u>Lewis</u> still applies to this case.  <u>See also</u> <u>United States</u> v. <u>Morgan</u>, 216 F.3d 557, 562-67 (6th Cir. 2000), <u>petition for cert. filed</u>, ___ U.S.L.W. ___ (U.S. Sept. 13, 2000) (No. 00-6270) (<u>Lewis</u> still applies to § 922(g)(1) offenses notwithstanding

-24-

1986 amendments to § 920(a)(20)); <u>United States</u> v. <u>Kahoe</u>, 134 F.3d 1230, 1234 (4th Cir. 1998) (same).[12]

Therefore, under <u>Lewis</u>, Snyder's belated success in vacating his 1992 stalking conviction bears no relevance to his conviction under § 922(g)(1). At the time that he was caught possessing a firearm, the 1992 conviction was still in effect, as was § 922(g)(1)'s concomitant prohibition on his possessing a firearm. The district court thus did not err in denying Snyder's motion for a new trial.

### III. CONCLUSION

For the foregoing reasons, the various rulings of the district court are affirmed.

---

[12]    Both <u>Morgan</u> and <u>Kahoe</u> rejected the holding of <u>Pettiford</u>, apparently construing the case to apply to § 922(g)(1) cases as well as § 924(e) cases. <u>Morgan</u>, 216 F.3d at 565; <u>Kahoe</u>, 134 F.3d at 1234-35. But because, as we hold here, <u>Pettiford</u> is properly restricted to the latter context, it is not in actual tension with <u>Morgan</u> and <u>Kahoe</u>.