**E-FILED**
**CNMI SUPREME COURT**
E-filed: Mar 16 2026 04:16PM
Clerk Review: Mar 16 2026 04:16PM
Filing ID: 78732085
Case No.: 2024-SCC-0016-CRM
Judy Aldan



IN THE

# Supreme Court

OF THE

# Commonwealth of the Northern Mariana Islands

---

**COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS,**
*Plaintiff-Appellee,*

*v.*

**SERGIO M. RANGAMAR,**
*Defendant-Appellant.*

**Supreme Court No. 2024-SCC-0016-CRM**

---

**SLIP OPINION**

**Cite as: 2026 MP 3**

Decided March 16, 2026

---

CHIEF JUSTICE ALEXANDRO C. CASTRO
ASSOCIATE JUSTICE JOHN A. MANGLOÑA
JUSTICE PRO TEMPORE PERRY B. INOS

---

Superior Court Criminal Case No. 23-0089-CR
Associate Judge Teresa K. Kim-Tenorio, Presiding

---

CASTRO, C.J.:

¶ 1    Sergio M. Rangamar was convicted of multiple offenses stemming from an alleged assault. He argues that the trial judge should have been disqualified under 1 CMC § 3308(a) because the judge presided over the Drug Court Program in which the key witness participated. He also contends the court violated his due process rights by denying his motion to compel disclosure of the key witness's Drug Court records without conducting an *in camera* review. We hold that the judge should have recused herself under Section 3308(a). We therefore vacate the judgment and remand the case for further proceedings before a different judge.

## I. FACTS AND PROCEDURAL HISTORY

¶ 2    Amanda Desebel ("Desebel") alleged that Sergio M. Rangamar ("Rangamar") fired a pellet gun in her direction while she was walking near his residence, striking her once in the ankle. Desebel testified she identified Rangamar based on prior familiarity with him. Another individual walking with her, Roderick Blanco, did not independently name the shooter at the scene but later identified Rangamar through a police identification procedure.

¶ 3    The Commonwealth charged Rangamar shortly after the incident. In an unrelated matter, Desebel was accepted into the Commonwealth's Drug Court Program ("Drug Court") on September 21, 2023. The judge assigned to Rangamar's case also presided over Drug Court and conducted regular review hearings at which Desebel appeared.

¶ 4    Rangamar moved to disqualify the trial judge, asserting that the ongoing Drug Court oversight of Desebel created an appearance of partiality because Desebel was a key witness. The trial court denied the motion.

¶ 5    Rangamar also sought records connected to Desebel's Drug Court participation and filed a motion to compel. The Commonwealth opposed the motion, arguing that the materials sought were not within the prosecution's possession and, to the extent they existed, were maintained by the Judiciary or third-party treatment providers. The trial court denied the motion without conducting an *in camera* review.

¶ 6    After the Commonwealth filed a second amended information, the case proceeded as a bench trial. Before trial, Rangamar moved for reconsideration of the denial of disqualification, citing the change in posture and intervening authority; the trial court denied reconsideration.

¶ 7    On February 2, 2024, Rangamar was found guilty of one count of assault and battery, one count of assault, and two counts of disturbing the peace. Rangamar timely appealed, challenging the denial of his motions for judicial disqualification under 1 CMC § 3308(a) and *in camera* review of Desebel's Drug Court records.

## II. JURISDICTION

¶ 8    We have appellate jurisdiction over final judgments and orders of the Superior Court pursuant to Article IV, Section 3 of the Constitution of the Northern Mariana Islands and 1 CMC § 3102(a).

## III. STANDARD OF REVIEW

¶ 9    We review the denial of a motion for judicial disqualification for abuse of discretion. *Commonwealth v. Caja*, 2001 MP 6 ¶ 2. Rulings on motions to compel discovery are reviewed de novo to the extent they turn on the scope of constitutional due process protections. *Commonwealth v. Campbell*, 4 NMI 11, 15 (1993). If the rulings comply with constitutional mandates, they are reviewed for abuse of discretion. *Commonwealth v. Hossain*, 2010 MP 21 ¶ 9.

## IV. DISCUSSION
### A. Disqualification Under 1 CMC § 3308(a)

¶ 10    Judicial disqualification under 1 CMC § 3308(a) turns on a single, objective inquiry—whether a reasonable person, fully informed of the relevant facts, would question impartiality. *Bank of Saipan v. Superior Court*, 2002 MP 16 ¶ 29; *Saipan Lau Lau Dev., Inc. v. Superior Court*, 2000 MP 12 ¶ 5. This objective test is often described as the reasonable person standard.

### 1. The Reasonable Person Standard and the Limits of Liteky

¶ 11    In applying the reasonable person standard, courts have long recognized that prior judicial exposure to a party or witness does not ordinarily require disqualification. Judges inevitably encounter the same individuals and factual contexts through the ordinary performance of their duties. Courts have a duty to hear and decide matters assigned to them. *See United States v. Holland*, 519 F.3d 909, 912 (9th Cir. 2008) (noting that the duty to sit derives from the judicial power and obligates judges to hear assigned cases absent a valid ground for recusal); *United States v. Snyder*, 235 F.3d 42, 45 (1st Cir. 2000) (explaining that a judge has as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require it). Recusal rules are therefore applied with restraint.

¶ 12    In *Liteky v. United States*, the Supreme Court articulated this practical limit, holding that opinions formed in the course of judicial proceedings "almost never" warrant recusal absent deep-seated favoritism or antagonism that would make fair judgment impossible. 510 U.S. 540, 555 (1994). If ordinary judicial exposure were sufficient to mandate recusal, routine adjudication would become untenable. *See In re Estate of Malite*, 2011 MP 4 ¶¶ 57–58 (citing *Liteky* for the conclusion that opinions formed from court proceedings are ordinarily immune unless they result in "pervasive bias").

¶ 13    *Liteky*'s rule, however, is confined to opinions formed during adjudication—rulings, courtroom statements, and impressions derived from evidence and argument presented in prior proceedings. *Id.* at 555. It does not insulate exposure to information acquired outside the evidentiary presentation of the case being tried. When a judge acquires knowledge in a setting where the

information was not subjected to adversarial testing, the concern is no longer whether the judge harbors deep-seated favoritism or antagonism. The inquiry instead becomes objective: whether that exposure creates a risk of partiality sufficient to undermine public confidence in the neutrality of the proceeding.

¶ 14    *Rippo v. Baker* confirms that recusal doctrine turns on objective risk rather than proof of actual prejudice. 580 U.S. 285 (2017). There, the Nevada Supreme Court rejected a bias claim because the defendant had not shown that the trial judge was "actually biased." *Id.* at 286. The Supreme Court of the United States vacated, explaining that this was the wrong inquiry. Due process may require recusal even without proof of subjective animus. The proper question is whether, considering all the circumstances, "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Id.* (quoting *Withrow v. Larkin,* 421 U.S. 35, 47 (1975)).

¶ 15    *Commonwealth v. Kaipat*, 1996 MP 20, illustrates this distinction in a bench trial context. There, the presiding judge had previously overseen the jury trial of the defendant's brother. *Id.* ¶¶ 4–6. During those proceedings, the prosecutor sought a continuance after alleging that the defendant had threatened a key witness outside the courtroom. *Id.* ¶ 6. The judge heard testimony from that witness in chambers and at a subsequent hearing and personally observed the witness's demeanor. *Id.* ¶¶ 6, 10. The following day, the defendant was charged with witness tampering arising from the same alleged threat, and the new charge proceeded to a bench trial before the same judge. *Id.* ¶ 7.

¶ 16    Because the case was tried without a jury, responsibility for assessing the credibility of that same witness rested solely with the judge as factfinder. *Id*. ¶¶ 10–12. Disqualification was therefore required. The exposure to disputed facts—acquired outside the evidentiary record of the new prosecution—bore directly on credibility determinations central to the verdict. *Id*. ¶¶ 12–15, 18. Having observed the witness's demeanor and heard representations about the alleged threat before the bench trial began, the judge effectively became "a witness to what had occurred." *Id*. ¶ 12. In those circumstances, the case fell outside *Liteky*'s safe harbor for ordinary judicial impressions.

¶ 17    *Kaipat* thus marks the boundary of *Liteky*'s protection. Information acquired in a prior judicial proceeding is not automatically immune from recusal analysis. When such exposure concerns disputed evidentiary facts central to a later case, it may constitute personal knowledge requiring disqualification. The concern here is therefore not the type of routine judicial impressions addressed in *Liteky*, but the appearance of partiality that may arise when a judge acquires familiarity with a witness outside the adversarial process in which the case will be decided.

¶ 18    The Commonwealth's recusal statute addresses these situations through two provisions. Section 3308(b)(1) requires disqualification where a judicial officer has "personal knowledge of disputed evidentiary facts concerning the proceeding." That provision addresses situations involving concrete, case-

specific knowledge bearing directly on issues to be resolved at trial. Section 3308(a), by contrast, serves a different function. Rather than addressing personal knowledge of disputed facts, it safeguards public confidence in the judiciary by requiring recusal whenever circumstances create a reasonable question about impartiality. *Saipan Lau Lau Dev., Inc. v. Superior Court*, 2000 MP 12 ¶ 5.

¶ 19    This case falls within Section 3308(a). Rangamar therefore need not demonstrate actual bias; the question is whether the circumstances create an objective appearance of partiality. The Supreme Court emphasized this principle in *Williams v. Pennsylvania*, where a justice of the Pennsylvania Supreme Court had previously served as the district attorney who authorized prosecutors to seek the death penalty against the defendant. 579 U.S. 1, 3–6 (2016). Years later, that same individual participated in the defendant's post-conviction appeal. *Id.* The Court did not ask whether the justice harbored actual bias. Instead, it held that his prior "significant, personal involvement as a prosecutor in a critical decision" in the same case created an unconstitutional risk of bias. *Id.* at 8–9. Because he had exercised prosecutorial discretion at a pivotal stage of the matter, his later participation in reviewing the case posed an objective probability of bias too high to be constitutionally tolerable, regardless of demonstrable prejudice. *See also Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883–84 (2009) (holding that due process required recusal where a litigant made extraordinarily large campaign contributions to a state supreme court justice while the litigant's case was pending before the court, creating an objective probability of bias).

¶ 20    At the same time, the standard is applied with restraint. *See Bank of Saipan v. Superior Court*, 2002 MP 17 ¶ 29 (reasoning that "the reasonable person standard is employed to prevent justice shopping and to ensure that a justice does not, 'at the mere sound of controversy,' abdicate his duty to preside over cases assigned to him, including the most difficult cases."). This limitation reflects the principle articulated in *Liteky*: ordinary familiarity with parties or witnesses acquired through the performance of judicial duties rarely warrants recusal. 510 U.S. at 555. To overcome that presumption, a party must identify circumstances showing that the judge's involvement created an objective appearance of partiality sufficient to place the case outside *Liteky's* safe harbor. Rangamar must therefore show that oversight of Drug Court created a situation in which a reasonable observer, fully informed of the relevant facts, would question impartiality.

### 2. Application of 1 CMC § 3308(a) to Drug Court Oversight

¶ 21    The dispute here centers on the reach of *In re Abraczinskas,* 2023 MP 12, which addressed disqualification where a judge had prior institutional contact with individuals involved in a case. The Commonwealth reads that decision narrowly, arguing it applies only when the prior relationship arises from workplace proximity within the judiciary. Rangamar reads it more broadly, contending that sustained judicial interaction with a witness—here through the Drug Court Program—creates the same appearance concerns addressed in *Abraczinskas*. The decision itself adopted a more contextual approach.

¶ 22　　*Abraczinskas* identified a set of contextual considerations—among them the number of judiciary employees involved, whether the decisionmaker had actually met or interacted with them, whether they were expected to testify, the spatial and institutional proximity of their employment, and whether the motion was promptly and sincerely raised. 2023 MP 12 ¶¶ 25–36. No single factor was deemed controlling. The conclusion rested on the cumulative effect of those circumstances, particularly where the implicated employees were key witnesses. *Id.* ¶¶ 29–33, 37.

¶ 23　　Drug Court is not simply another criminal docket. It is a specialized judicial program designed to be non-adversarial and rehabilitative, in which the judge plays an active supervisory role. NMI DRUG CT. P. P. 1–2. Participants appear regularly—here, approximately once per week—and the judge interacts with them concerning compliance, treatment progress, and personal circumstances. App. at 97. The program includes monitoring through frequent drug testing, counseling, and case management. App. at 56–57, 60. Unlike a criminal trial, these proceedings do not involve adversarial presentation of evidence or structured credibility testing through cross-examination. Instead, impressions of honesty and reliability are formed in a supervisory, treatment-oriented setting.

¶ 24　　Those program-based interactions take on particular significance when the judge is later required to evaluate the credibility of a Drug Court participant who appears as a key witness in a criminal prosecution. Credibility determinations are central to the factfinding function. *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). Where a judge has repeatedly interacted with a witness in a non-adversarial supervisory setting, those prior impressions may reasonably be viewed as bearing on the later task of evaluating the witness's testimony. *See, e.g.*, *Liteky,* 510 U.S. at 551; *Rippo*, 580 U.S. at 287; *Williams*, 579 U.S. at 8–9; *Caperton,* 556 U.S. at 883–84; *In re Murchison*, 349 U.S. 133, 136–37 (1955).

¶ 25　　Under *Abraczinskas*, the inquiry focuses on the cumulative effect of the circumstances. Here, the relevant considerations include the judge's ongoing supervisory relationship with the witness through Drug Court, the frequency and nature of their prior interactions, and the central role the witness's testimony played in the prosecution's case. These factors collectively bear on whether a reasonable observer would question the judge's impartiality in assessing the witness's credibility.

¶ 26　　The circumstances here required disqualification. The judge had engaged in sustained, non-adversarial supervisory interactions with the witness through Drug Court, and that witness's credibility was central to the determination of what occurred. In a bench trial, where credibility assessments are dispositive, the cumulative effect of those non-adversarial interactions with a key witness bears directly on public confidence in the court's neutrality.

¶ 27    Desebel was admitted to the Drug Court Program on September 21, 2023—approximately two months after the July 19, 2023 shooting—and remained an active participant through the February 1, 2024 bench trial. During that roughly nineteen-week period, she appeared before the same judge in regular Drug Court proceedings while also serving as the prosecution's key witness. A reasonable observer, fully informed of those circumstances, could question whether impressions formed through repeated Drug Court proceedings might influence the later assessment of the witness's testimony. Section 3308(a) is directed to that objective appearance of impartiality. Our holding is narrow: sustained, non-adversarial supervisory interactions with a key witness, rather than mere prior judicial acquaintance, create an objective appearance of partiality in a bench trial where credibility is central.

*B. Due Process Did Not Require In Camera Review of Confidential Records*

¶ 28    Rangamar argues that due process required the trial court to conduct *in camera* review of Desebel's confidential Drug Court records before denying his motion to compel disclosure. Resolution of that claim turns on the scope of constitutional disclosure obligations and the threshold showing necessary to justify access to protected materials. Those principles foreclose relief here.

*1. This Case Does Not Present a Brady Disclosure Issue*

¶ 29    *Brady v. Maryland* requires the prosecution to disclose evidence favorable to the accused that is material to guilt or punishment. 373 U.S. 83, 87 (1963). The obligation encompasses both exculpatory evidence and impeachment material bearing on the credibility of a significant government witness. *See Commonwealth v. Campbell*, 4 NMI 11, 15 (1993). Brady addresses the suppression of evidence by the prosecution. The duty extends to information known to those "acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). The doctrine therefore applies to evidence within the prosecution team's institutional control.

¶ 30    Rangamar argues that the court was required to conduct an *in camera* review under *Commonwealth v. Guerrero* because, in his view, *Guerrero* instructs the trial court to examine disputed materials when the parties disagree about whether they contain Brady information. But *Guerrero* addressed a very specific situation: the defendant sought access to an investigative report located in the prosecution's own files, and the government refused to disclose it while asserting that no Brady material was present. In that context, the Supreme Court held that an *in camera* review was appropriate because the dispute concerned evidence within the prosecution's possession and control. *Guerrero* thus guides the handling of contested materials held by the government, not confidential Drug Court Program records generated outside the investigative and prosecutorial process.

¶ 31    This case presents a different situation. The records Rangamar sought are maintained by the Drug Court Program, a court-administered treatment program that operates through a collaborative "Drug Court Team." The governing policies define that team as including representatives from both the Office of the Attorney

General and the Office of the Public Defender or other defense counsel. NMI DRUG CT. P. P. § 1(g)(7). The policies thus place the prosecution and defense in parallel roles within the program's collaborative framework. Drug Court materials are not prosecution files; they are confidential program records generated and maintained within a judicial treatment program rather than within the investigative or prosecutorial process. Accordingly, *Brady* is not implicated.

### 2. Rangamar Did Not Establish a Basis for In Camera Review

¶ 32    Even where *Brady* does not apply, due process may, in limited circumstances, permit court-supervised review of confidential records held by an independent custodian. That authority, however, is not automatic. It is triggered only when the defendant makes a threshold showing sufficient to justify review of protected files.

¶ 33    The United States Supreme Court articulated that threshold requirement in *Pennsylvania v. Ritchie*, which involved a defendant's request for confidential child protective services records. 480 U.S. 39, 58 (1987). While the Court recognized *in camera* review as an appropriate means of resolving concrete disclosure disputes involving confidential material, it squarely rejected the notion that such review is automatic. *Id.* at 58 n.15. A defendant must first make "some plausible showing" that the records sought contain information that is both favorable and material to the defense. *Id.* (citing *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)). Mere conjecture is insufficient.

¶ 34    That same gatekeeping standard was adopted in *Commonwealth v. Hossain*. 2010 MP 21 ¶ 13. *In camera* review of confidential records is warranted only when the defendant articulates a non-speculative basis for believing that the records are likely to contain material evidence. The request in *Hossain* sought protected records on the theory that they might contain impeachment material, but no specific factual showing demonstrated a reasonable likelihood of material evidence. *Id.* ¶¶ 13–15. The mere possibility that confidential files might contain something useful does not require *in camera* review. *Id.* ¶ 20.

¶ 35    That threshold reflects the limited function of *in camera* review. Although it is more restrained than unrestricted disclosure, it still entails access to confidential materials and implicates privacy, confidentiality, and the operation of specialized programs. Due process demands a concrete, fact-based showing before such review is authorized, rather than a generalized assertion that a category of records could bear on credibility.

¶ 36    In *Ritchie*, the confidential file at issue was created by Children and Youth Services in direct response to the same abuse allegations underlying the prosecution. 480 U.S. 39, 43–45 (1987). The agency had interviewed the complaining witness about the charged conduct and generated investigative reports concerning those allegations. *Id.* at 57–58. The defendant therefore identified a specific reason to believe the file contained prior statements and other information directly related to the events at issue. Limited *in camera* review was

required to determine whether those known investigative materials contained exculpatory evidence.

¶ 37    No comparable showing was made here. The file in *Ritchie* was an investigative file created in response to the same allegations underlying the prosecution. Drug Court files, by contrast, are generated for supervision and rehabilitation, not to investigate the charged offense.

¶ 38    Rangamar's motion sought "information regarding [the alleged victim's] substance use, instances of dishonesty, and other information that could be considered Brady material." App. at 58. In his reply, he further requested "information that shows that the Drug Court judge found the Government's witness violated the terms of the court by being dishonest," as well as "any allegations of dishonesty" and "any information revealed in the course of treatment or in court regarding the allegations against [Defendant], and the Government witness's substance use near the time of the incident." App. at 58. These requests did not identify a specific statement, report, or document within the Drug Court file. Instead, they assumed such material might exist and asked for a search of confidential records to determine whether it did. That is precisely the type of "overly broad" request that *Hossain* rejects. 2010 MP 21 ¶ 20.

### 3. Rangamar Did Not Establish Materiality

¶ 39    Even assuming a threshold showing sufficient to justify review, the motion independently fails because it does not establish materiality. Due process does not require disclosure of every piece of favorable information; it requires disclosure only of evidence that is material to guilt or punishment. The materiality requirement serves an important limiting function. It ensures that post-trial speculation about marginal impeachment does not unsettle otherwise reliable verdicts. The question is not whether additional information might have been helpful, but whether there is a reasonable probability that its disclosure would have produced a different result—one sufficient to undermine confidence in the outcome. *United States v. Bagley*, 473 U.S. 667, 682 (1985). The mere possibility that undisclosed information might have assisted the defense does not suffice. *United States v. Agurs*, 427 U.S. 97, 109–10 (1976).

¶ 40    *Turner v. United States*, 582 U.S. 313 (2017), illustrates the point. There, the government failed to disclose several items of impeachment and alternative-suspect evidence. Materiality was not established because, viewed cumulatively and in the context of the entire record, the information would not have altered the evidentiary picture in any meaningful way. *Id.* at 324–25. Although the undisclosed material could have supplied additional avenues of cross-examination, it did not fundamentally weaken the prosecution's case. Materiality does not turn on whether counsel might have conducted a more forceful impeachment; it turns on whether the suppressed evidence would reasonably have led to a different verdict. *Id*. at 325–26.

¶ 41    The same principle governs here. Desebel's credibility was not insulated from scrutiny. Cross-examination addressed substance use and related credibility

concerns. The factfinder was therefore aware of potential grounds to question reliability and nonetheless credited her testimony. Confidential Drug Court records could be material only if they were likely to contain impeachment of a different character or substantially greater probative force—such as a prior inconsistent statement about the shooting itself, an admission contradicting her identification of Rangamar, or documented findings directly undermining her account of the events. *See Kyles v. Whitley*, 514 U.S. 419, 434–35 (1995) (materiality asks whether the suppression of the evidence would cast doubt on whether the trial outcome was correct).

¶ 42    No non-speculative basis was offered to believe the Drug Court file contained such evidence. The request rested instead on the generalized assumption that additional information about substance use or dishonesty might exist. Under *Bagley* and *Turner*, that is insufficient. Where impeachment on the same themes was already presented and weighed, the speculative possibility of further cumulative material does not create a reasonable probability of a different verdict. Accordingly, materiality was not shown.

### V. CONCLUSION

¶ 43    The trial judge's ongoing supervisory relationship with the key witness through the Drug Court Program created circumstances in which a reasonable person could question the court's impartiality under 1 CMC § 3308(a). Because the witness's credibility was central to the determination of what occurred, disqualification was required to preserve public confidence in the neutrality of the proceeding.

¶ 44    Rangamar's separate claim regarding disclosure of Drug Court records does not warrant relief. The requested materials were not within the prosecution's possession for purposes of *Brady*, and Rangamar did not make the threshold showing required to justify *in camera* review of confidential program records. The trial court therefore did not err in denying the motion to compel.

¶ 45    The judgment of conviction is VACATED, and the case is REMANDED for further proceedings before a different judge. The denial of Rangamar's motion to compel disclosure of Drug Court records is AFFIRMED and remains binding on remand.


SO ORDERED this 16th day of March, 2026.


/s/
ALEXANDRO C. CASTRO
Chief Justice

/s/
JOHN A. MANGLOÑA
Associate Justice

  /s/
_____
PERRY B. INOS
Justice Pro Tempore

COUNSEL

Bruce Berline, Saipan, MP, for Appellant.

J. Robert Glass Jr., Saipan, MP, for Appellee.

NOTICE

*This slip opinion has not been certified by the Clerk of the Supreme Court for publication in the permanent law reports. Until certified, it remains subject to revision or withdrawal. If any discrepancies arise between this slip opinion and the opinion ultimately certified for publication, the certified opinion will control. Readers are requested to bring any errors to the attention of the Clerk of the Supreme Court at P.O. Box 502165 Saipan, MP 96950; telephone (670) 236–9715; or e-mail Supreme.Court@NMIJudiciary.gov.*

**E-FILED**
**CNMI SUPREME COURT**
E-filed: Mar 16 2026 04:16PM
Clerk Review: Mar 16 2026 04:16PM
Filing ID: 78732085
Case No.: 2024-SCC-0016-CRM
Judy  Aldan



IN THE

## Supreme Court

OF THE

## Commonwealth of the Northern Mariana Islands

---

**COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS,**
*Plaintiff-Appellee,*

**v.**

**SERGIO M. RANGAMAR,**
*Defendant-Appellant.*

---

**Supreme Court No. 2024-SCC-0016-CRM**
Superior Court No. 23-0089-CR

**JUDGMENT**

Appellant Sergio M. Rangamar appealed his convictions of assault and battery, assault, and two counts of disturbing the peace and his sentence in Criminal Case No. 23-0089. For the reasons set forth in the accompanying opinion, the Court VACATES the judgment of conviction, AFFIRMS the denial of the motion to compel disclosure of Drug Court Records, and with this denial remaining binding on remand, the case is REMANDED for further proceedings before a different judge.

ENTERED this 16th day of March, 2026.


 /s/ _____

JUDY T. ALDAN
Clerk of Court